IN THE MATTER OF THE ESTATE OF D. V. B. HENARIE, DE-
CEASED.

[No. 22,363; decided March 28, 1901.]

**Community Property, What is.**—On the Application for Partial
Distribution by the widow in this case, the court finds that the in-
vestment of $10,000, out of which the estate of the decedent de-
veloped, was community property, with the possible exception of $100
raised by him from the sale of a watch owned by him before mar-
riage.

**Community Property—Adjustment of Right to in Dismissal of Di-
vorce and Execution of Release.**—Where a woman institutes an action
for a divorce and a division of the common property, but before an-
swer filed the suit is dismissed by stipulation, and as a part of the
proceedings she receives valuable consideration in full settlement
thereof and executes a receipt to that effect, the dismissal and release
operate as a bar to a petition by her for partial distribution after
his death.

Application for partial distribution by Mary A. Henarie,
the widow of the decedent.

Van R. Paterson, and E. B. Young, for the petitioner.

A. Heynemann, for the respondent, Radgesky.

Myrick & Deering, for the absent heirs.

COFFEY, J.   Mary A. Henarie petitions the court, alleg-
ing that she is the surviving wife of D. V. B. Henarie, who
died in San Francisco, of which city he was a resident, on
the 28th of November, 1899, leaving a last will admitted to
probate on the 23d of February, 1900; that all the property
of which the testator died seised was community property,
acquired after their intermarriage on December 24, 1854, to
one-half of which she is entitled in her right as surviving
spouse.   This is the pith of her petition.

In opposition the legatees and devisees deny each and all
of the allegations specifically, and assert that petitioner, for
a valuable consideration, on the 27th of February, 1886, re-
leased, relinquished, renounced, waived and surrendered any
and all rights she had or may have, or might, could, would,

or should have or have had to any of the property of decedent, separate or community; and that on or about the 2d of January, 1889, for a valuable consideration, she made, executed and delivered an instrument in writing in full settlement, satisfaction and discharge of any interest which she might have in the community property of the intermarriage of herself and decedent.

Opponents further aver that petitioner instituted a suit for divorce against decedent involving the community rights of the parties, and that in said proceeding for a dissolution of their marriage she did receive valuable consideration in full settlement, satisfaction and discharge of her claims to any of the community property, and that pursuant to the terms of settlement a judgment of dismissal of the action was given and entered on January 9, 1889, and that by reason of these premises she is forever barred and estopped from claiming any right in the estate of decedent.

Opponents finally aver that petitioner has property acquired by her subsequent to her marriage with decedent, otherwise than by gift, bequest, descent, or devise, and that the same is community property; that the same is of great value, and they ask that she be compelled to disclose the facts in regard thereto, and they assert that at least one-half thereof is subject to the testamentary disposition of the decedent.

At the time of their marriage on December 24, 1854, the parties were penniless, at least they were substantially without property, and each was without employment, and it was not until about eight months thereafter that the husband secured an engagement as a clerk in a hotel; in that situation he subsisted for about eight months more, and then work became slack and irregular until September 1, 1856, when he entered the mercantile house of Peter Chrystal, where he continued for two years. During his service as a hotel clerk he received $100 a month and found. Of his salary he gave one-half to his wife, a thrifty and industrious woman, who rented rooms to lodgers and kept a boarder, and in every way known to a frugal and skilled housekeeper saved every penny possible until she accumulated a sum of $500 out of the money given to her by her husband "to live on." After

two years spent with Chrystal an opportunity offered to the husband to form a copartnership connection with E. Martin in the liquor business, Mr. Martin proposing to sell him an interest for $1,000. He communicated this proposal to his wife, but lamented his lack of the wherewithal, having but $400 in cash, whereupon she revealed to him that she had saved out of what he had given to her $500, which she then and there gave to him and he sold his watch for $100, thus making the requisite sum of $1,000, with which he purchased an interest in the firm of E. Martin & Co., thus laying the foundation of the fortune of which he died possessed.

According to the testimony of the wife, he was engaged in no other business, and continued to be so exclusively occupied down to the year 1886, when in February of that year, differences having arisen between them, there was an adjustment in the form of a deed of separation, which is here inserted:

"This indenture made and entered into this 27th day of February, A. D. 1886, by and between D. V. B. Henarie, of the City and County of San Francisco, State of California, the party of the first part, and Mary Ann Henarie of the same place, the party of the second part, Witnesseth:

"That whereas the parties hereto have been for many years and still are husband and wife, and

"Whereas, unhappily differences and disagreements have arisen, and do still subsist, between them by reason whereof they have agreed to live separate and apart from each other during their natural lives.

"And whereas the party of the first part has this day conveyed, transferred and assigned by Deeds purporting to be Deeds of Gift of real property and certain transfers of personal property to the party of the second part to hold, possess, and enjoy as her separate property and estate, Sixty (60) shares of the Capital Stock of the Chico Gas Company, sixty-seven (67) shares of the Capital Stock of the National Bank of Stockton, and two hundred (200) shares of the Capital Stock of the San Francisco Gas Light Company, and certain real estate situate in the Counties of Butte, Humboldt and San Diego in this State, which said real estate is particularly and fully described in four certain Deeds of Conveyance made this day by the party of the first part, to the party

of the second part, reference to which said deeds and each and every thereof is hereby made for a full and perfect description of said real estate; and has executed to her his certain promissory note for the principal sum of $11,169.28 payable in one year from date and bearing interest at the rate of six per cent annum, interest payable monthly.

"Now, therefore, in consideration of the premises, and of the said conveyances and of the mutual consent and agreement of the parties hereto, they have covenanted and agreed and by these presents do covenant and agree to and with each other that they shall and will, at all times hereafter live separate and apart, free from the molestation or control, each of the other, and from all connubial association or relation.

"And the party of the second part, for and in consideration of the premises, and particularly of the conveyances, transfers and assignments hereinbefore referred to, does hereby covenant and agree to and with the party of the first part, that she will not at any time hereafter compel or require the said party of the first part to cohabit or live with her, and that the said party of the first part shall be to all intents and purposes whatsoever, freed and discharged from the power, will and constraint of the party of the second part, and that she will not molest, hinder, interrupt, interfere with, or disturb him in his manner of living or in his liberty or freedom of going to, or staying in, or returning from such place or places as he shall think proper, and that saving and excepting her preservation of her rights in the community property of herself and the said party of the first part she will not claim nor demand nor have any ownership of, any property which the said party of the second part now has, or may hereafter acquire an interest therein, or any maintenance or support from him, and that she will, from and after the date hereof, entirely support and maintain herself from and out of her separate estate, and that she will waive and renounce all right or claim to institute legal proceedings against the party of the first part, for a divorce or for a dissolution of the marriage tie between them.

"And the party of the first part for and in consideration of the premises, does hereby covenant to and with the party of the second part and her heirs and assigns that all and

every of the real estate, described in the conveyances herein-before referred to are free and clear of all encumbrance made or suffered by him, or by any person or persons claiming through or under him.

"In witness whereof, the parties hereto have hereunto and to duplicate hereof, set their hands and seals, the day and year first above written.

"(Seal)                    D. V. B. HENARIE.
"(Seal)                    MARY A. HENARIE.
"Signed, sealed and delivered in the presence of
                           "J. F. WENDELL.
                           "EUGENE W. LEVY."

(Annexed to the above instrument are the separate acknowledgments of the parties, both taken before Notary Public Eugene W. Levy, on February 27, 1886.)

Decedent continued his allowance of $50 a month to his wife from 1858 until 1871, and pursuing the same provident course she saved and invested her money. Between 1858 and 1867 she received by gift from her husband and savings $4,000, and in 1867 purchased property on Pine street. He paid her $40 a month rent for this property from 1867 until he built an addition to the house and paid her $6,000, which was then its value. In 1876 he deeded to her this property, and from that time on it is claimed by her counsel that it was her separate property as well as the personal property therein.

From April, 1876, to August, 1878, they resided in the cottage on Taylor street and let the house fronting on Pine street, and from August, 1878, they lived in the Pine street house and let the cottage on Taylor street.

At the time of separation, February, 1886, as is seen by the agreement hereinabove inserted, he made deeds of gift to her of the Pleasanton, Chico, Eureka, and San Diego properties, and gave her his note of hand for $11,169.28 payable as therein provided, and in consideration of the premises she agreed, among other things, that saving and excepting her preservation of her rights in the community property of herself and him, she would not claim nor demand nor have any ownership of any property which he had at that date or might thereafter acquire, or any interest therein, or any main-

tenance or support from him, and that she would from and after that date entirely support and maintain herself from and out of her said separate estate, and that she would waive and renounce all right or claim to institute legal proceedings against him for a divorce.

Notwithstanding this final clause to forbear and renounce any claim or right to divorce, she did institute proceedings in that behalf on April 30, 1888, by filing a complaint which charged defendant with adultery, and alleged that since their intermarriage the parties had earned, acquired and accumulated a large amount of property of the value of one million of dollars or thereabouts, the legal title to which was in his name, but the whole of which was their community property, describing it as the wholesale liquor business carried on by the name of E. Martin & Company, a large number of shares of the Eastern Oregon Land Company, Leak Glove Company, and other real and personal property. Another count in this complaint alleged extreme cruelty, grievous mental suffering caused by his adulterous conduct and its consequences, and repeating the allegation as to community property. Finally, she demands judgment for a dissolution of the bonds of matrimony, costs and counsel fees, alimony, apportionment of common property, injunction against alienation, and appointment of a receiver pending divorce proceedings.

An amended complaint was filed on December 19, 1888, in which substantially the same causes of action were pleaded, but the allegations as to community were modified by omitting particular description thereof from inability to set forth specifically.

To this complaint a demurrer was interposed assigning several specific grounds as to the charges of adultery and raising the issue of law with respect to community property, because it did not appear from the allegations what was the value of the community property, in that the same was said to be of the value of $1,000,000 or thereabouts, and did not state with particular certainty what was the value of the said property; and that it did not appear how much the said property had earned nor how much was acquired, nor whether it was or was not acquired by one of them by gift, bequest, devise or descent, or with the rents or issues or profits

of said property, nor did it appear how much the said property had accumulated, nor with what means, nor that said property was acquired or accumulated as the result of the joint or several exertions or skill or labor of the parties or either of them.

It is contended on this hearing by the respondents that this demurrer made the same point in relation to the different kinds of community property which they have raised here supporting their contention that the deed of separation reserved rights in community property only the result of their joint efforts.

This was the state of the record when on December 31st, 1888, pursuant to stipulation a judgment of dismissal was entered. The stipulation was in the following form, after title of court and cause:

"It is stipulated and agreed by and between the parties hereto, that the above-entitled cause be and the same is hereby dismissed, each party paying his own costs, and that judgment may be entered accordingly.

"Dated, San Francisco, December 31, 1888.

"GORDON & YOUNG,
"Attorneys for Plaintiff.

"McALLISTER & BERGIN,
"Of Counsel.

"GARBER & BISHOP,
"Attorneys for Defendant."

Upon this followed a judicial order in this form:

"Title of Court and Cause.

"Upon reading and filing stipulation of parties to the above-entitled action, it is ordered that the said action be and the same is hereby dismissed, each party paying his own costs, and that judgment be entered accordingly.

"WM. T. WALLACE,
"January 8, 1889.                                      Judge."

Finally came the following entry in the record:

"Title of Court and Cause.

"January 8, 1889.

"In this action, upon filing stipulation and upon application of counsel for respective parties, it is hereby ordered that this action be and the same is hereby dismissed.

"Wherefore by virtue of the law and by reason of the premises aforesaid it is ordered, adjudged and decreed that Mary A. Henarie, plaintiff, do take nothing by this her said action as against Daniel V. B. Henarie, defendant, but that a judgment of dismissal be and the same is entered herein."

Subsequent to the stipulation and prior to the dismissal, to wit, on January 2, 1889, an instrument was executed by the plaintiff which seems to have furnished a motive for the termination of the divorce proceedings. This instrument is in these terms:

"Received of D. V. B. Henarie the sum of $3,000 and other valuable consideration, in full settlement, satisfaction and discharge of all matters in controversy in the case of Mary A. Henarie vs. D. V. B. Henarie in the Superior Court of the City and County of San Francisco, State of California, Department No. 6, No. 22,854, with date."

It is contended that this document, which is a part of the proceedings in divorce and in this application, operates as a full and final release by petitioner of all claims past, present, and future on, in or to the estate of decedent, and that in addition to the stipulation for the dismissal all matters in controversy in that action were settled, satisfied and discharged, including necessarily her claim of community property, as that was one of those matters, and that in the light of this instrument the doctrine of retraxit applies with increased emphasis, making the judgment in that suit a complete bar to the proceeding herein for partial distribution.

This is the nub of the whole case.

It is claimed by counsel for petitioner that everything she possessed at the time of filing this application was and is her separate property, and that she had no community property; but that is not now the question before the court, although it is asserted that every dollar in her possession is the increment of the original gift of $6,000 and the income from the house on Pine Street. These sources, together with the acquisitions by deeds from her husband to her and the avails of the property so acquired, constituted her separate property, the deeds made by him to her in February, 1886. All that he had at the time of his death was the product of his investment in E. Martin & Company, and was the outcome of

the purchase of an interest in that firm, to which he was aided by the contribution of his wife; hence it was all community; no act of his could have changed its legal character. Her community rights were not affected by the articles of separation, while her separate property was recognized and confirmed; he certified on the record as to her separate property and the mode of its acquisition; the reservations, express and implied, in the articles protected her present claim, and that agreement should not be construed to alter or affect conditions which were not intended to be within its scope. But whatever may be the construction of the deed of separation, does not the determination of this application depend upon the outcome of the divorce proceedings and the issues involved therein?

Petitioner insists that the question of property was simply incidental and collateral; the issue was one of *divorce* on certain grounds and not of division of property; the proceedings in the divorce suit are all before this court; there was no answer in the case; there was no trial on the merits; there was no failure to prove the allegations of the complaint; the judgment in such a case does not amount to a retraxit; it does not act or operate as a forfeiture of her right to maintenance or to her share in the community property. Because she chose to dismiss that action or suffer a dismissal, did she forfeit a right which could not come into existence until the occurrence of a contingency which did not happen until twelve years thereafter, namely, the death of her husband? The judgment was "that she take nothing by the action"— that is, that she have no divorce. Only upon that issue was the judgment operative and conclusive; only upon the facts directly in controversy—adultery and cruelty. Matters only incidentally and collaterally in issue are not touched by such a judgment; the renunciation or release or receipt, whatever or whichever it may be termed, in no wise concluded her community or property rights.

Counsel for respondent claim that the clause in the agreement of separation which reads, after agreeing that they shall live separate and apart, "and that saving and excepting her preservation of her rights in the community property of herself and the said party of the first part, she will not claim or

demand or have any ownership of any property which the said party of the first part now has, or may hereafter acquire or any interest herein, or any maintenance or support from him, and that she will from and after the date hereof entirely maintain and support herself from and out of her said separate estate,'' refers to the preservation of rights in such property as might be acquired thereafter by their joint efforts; and that there is no evidence in this record of the existence of such property. It is contended by counsel that at the date of this agreement, February 27, 1886, there were three kinds of community property: 1. Acquired by the husband after marriage; 2. Acquired by the wife after marriage; 3. Acquired by both. This contention is supported by sections of the code needless to insert here, and by decisions interpreting the civil law as it was applied in California prior to the adoption of our first statute on the subject in 1850. The same counsel claims that at the date of the deed of separation no more than two-fifths of that property could be community property, for the reason that it was all the result of the investment of $1,000, $600 of which was Henarie's separate property, and not more than $400 of which could have been community property. In February, 1886, Henarie had property of the value of $270, the result of this $1,000 investment. Two-fifths of that, to wit, $180, was community property, we will say—not more. One hundred and sixty-two thousand dollars, at least, was separate property. Of the $108,000, Henarie gave to Mrs. Henarie $90,000 (in fact, $91,000), leaving $18,000 in his hands, and not more, as community property. Assuming that she used this with the three-fifths of the whole—that is with the $162,000—and we have $162,000, plus $18,000, to wit, $180,000 worth of property with which he made the estate with which he died seised. Of this $180,000, $18,000 is but one-tenth and therefore the product of one-tenth, and no more could be community property—that is, only one-tenth of the property of which he died seised was community property; and of this one-tenth the utmost that Mrs. Henarie could claim would be one-half, so that all she could receive would be one-twentieth of the estate which he left for her community share.

This was the situation, it is claimed by counsel for respondents, with regard to property rights of the respective parties at the time of the deed of separation, February 27, 1886.

It appears from the deposition of defendant in the divorce suit that at the time of the separation in 1886 decedent conveyed to his wife about one-third of the whole amount of the property then held by him, or in value as $90,000 is to $270,000, having previously given her from time to time about $35,000 in property and money.

This court does not subscribe to the theory of counsel for respondents as hereinabove summarized. The evidence shows that the petitioner's possessions at the time of this application were all her separate property, and it is immaterial how much she possessed, if it be separate; the probate court, moreover, has no jurisdiction to settle questions of title on distribution. As the supreme court has repeatedly decided, there are many matters relating to estates of deceased persons of which the probate court has no jurisdiction, and this is one of them. What she received from her husband on the occasion of the separation and what he had previously given to her became thereby her separate property, saving rights of creditors existing at time of transfer. This was the understanding of both parties, according to the evidence of each.

As to the origination of the property and its consequent character, my conclusion is, from the testimony and from the application thereto of the authorities, that the prime investment, $1,000, out of which the fortune developed, was all community property, with the possible exception of the $100 the husband raised on the watch, which was about all he owned at the time of his marriage. In his deposition taken August 24, 1888, he testified that when they intermarried on Christmas Eve, 1854, he had "not anything of account" and was in no business, and she was equally endowed. Afterward he secured employment, gave her money monthly out of his earnings for household expenses; she took a boarder and lodgers, toiled and scrimped and denied herself until she had saved $500, which sum, when the chance came to him to purchase an interest in E. Martin & Co., she contributed to make up the amount needed for that investment; the balance

he furnished as stated. If the amount raised on the watch is to be taken into account as separate property of the husband, then there were nine parts community and one part separate property in the common stock which produced the great profits of the business of E. Martin & Co. that finally centered in the sole dominion of decedent.

It is contended by counsel for respondents that under the articles of separation the right reserved by the wife was to preserve her interest in whatever might be in future the product of joint endeavor; that only in such community property as should be the result of the joint efforts of both herself and her separated spouse was she to share. As there was no concerted action or united endeavor subsequent to the separation, there could be no such result, if that were what was contemplated by the parties, and the record discloses that this third kind of species of community property has no existence. This court does not consider that such was the design of the draftsman of that document or of the parties thereto. In drawing the deed of separation language was carefully chosen and aptly applied by her attorney, and she herself was a woman of uncommon clearness of mind and intellectual energy, a most remarkable person, of great mental acumen, according to her counsel in this case; and this tribute is indorsed by opposing counsel, who conducted her examination, who described her mental character, notwithstanding age and physical infirmities, as sound, acute and robust, with a marvelous memory, definite and exact to a degree, a shrewd judge of human nature, with a keen eye to the main chance, thoroughly alive to her own interests.

These encomiums are borne out by a perusal of her deposition, which shows that to an advanced age, while prostrated with incurable illness, she preserved and exhibited alertness and sharpness of faculty and a wariness and ability that made her more than a match for the most masterly antagonist. Such a woman scarcely needed the advice or assistance of an attorney, except to attend to professional details, and in essentials she was able to cope with counsel of erudition and experience; but in the business she transacted with her husband in the matter of the separation, and subsequently, she

had, in addition to her own talents, the advantage of aid from gentlemen of approved legal skill and culture, and the instruments prepared by them and executed by her were the reflex of her judgment based upon her belief as to her property rights and claims. A woman of her penetration and sagacity was not apt to be imposed upon by deception or artifice, and none was practiced upon her.

Assuming now that this court has a correct conception of the law as to the community property and has given it intelligible expression, what was the effect of the proceedings in the divorce suit upon petitioner's claims herein? That is the question before the court. It is a new question, in which the principle is not as plain as a pikestaff. The authorities cited on either side do not touch the precise point, and the court must reason it out upon first principles. The nature of an action for divorce must be considered and construed; the effect of a judgment of dismissal as a retraxit; when a dismissal will operate as a bar to subsequent action; what is a cause of action in such case; the interpretation of the receipt or release, whether it be a surrender or abandonment by the wife of community rights; the relations of the parties after separation: all these questions as they arise to the surface in the course of this controversy are interesting and some of them novel.

Counsel for petitioner claim that in the action for divorce the question of property was subordinate to the main issues, the causes of action—adultery and cruelty—and that the judgment of dismissal did not, and could not, reach matters only incidentally and collaterally connected with the grounds of complaint, and that the receipt introduced here necessarily in no wise enters into the discussion of the community rights.

An action for divorce proceeds primarily upon the proposition that the defendant has committed a breach of the marriage contract entitling the plaintiff to a decree of dissolution; but when there is property, something more is implied according to the circumstances pleaded. So that in this case the facts in issue were, first, the acts imputed to defendant, and, secondly, the existence and apportionment of community property. These issues were tendered by plaintiff and were directly involved in the judgment. They were all the sub-

ject of examination by counsel, as appears from the depositions in the divorce suit, and such great stress was laid upon the matter of property in the taking of testimony that there is some excuse for the criticism of one of the counsel for respondents that property was really the paramount issue, divorce the mere means to the end of obtaining a larger share of his property. In the course of that searching inquisition into the resources of defendant every particle of his property and its disposition was traced, and his conscience was probed until no concealment of his possessions seemed possible. In addition, at the request of her counsel defendant furnished memoranda and list of properties involved in that action.

It is claimed by petitioner that in the suit for divorce the question of property was merely an incident; that the property could not be considered until the ground for divorce was established; but I think that this view was not correct, for the issues were tendered by the pleadings, and embraced the grounds of divorce and property rights. The parties undertook to litigate their rights as to community. The points raised by counsel for defendant in that case on demurrer were substantially the same as those urged by respondents on this application; they did not compromise collateral or incidental issues, but facts in issue tendered by the complaint— facts upon which the plaintiff proceeded by her action and which the defendant controverted by his plea, not collateral facts or probative matter offered in evidence to establish those issues. The former extends to every question necessarily litigated between the parties; the latter to that which is evidentiary or prohibitive of the former; matter which is incidentally cognizable to the issue, only collateral to the facts in the issue made by the pleadings; introduced in evidence to establish the main facts litigated. What were the main facts litigated in the divorce suit? An examination of the pleadings and the evidence shows that they comprehended grounds of divorce and community right in property. These were the material issues upon which joinder was made.

The issue being material, necessarily litigable, was determinable and determined by the dismissal.

If, then, the community right was a material issue in that cause, as it was raised by the pleadings there and is again

raised in this proceeding, the determination in the divorce case is an estoppel by judgment here. Taken in connection with the paper of January, 1889, construed as a release, it operates as a complete bar to any further attempt to litigate the facts in issue in divorce proceedings. A judgment of dismissal in the circumstances recited in this case, pursuant to stipulation, each party paying his own costs, amounts to the open voluntary renunciation of a suit pending, which must be held to operate a retraxit.

What is a retraxit? It is a bar to all actions of a like nature; it is the withdrawal by plaintiff of his suit; and the legal deduction from such a withdrawal followed by a judgment by consent, as in this case, is that the parties had, by their agreement, adjusted the subject matter of controversy in that action; and the legal effect of such a judgment is, therefore, that it will operate as a bar to any other proceeding between the same parties on the cause of controversy then adjusted by the parties and merged in the judgment thereon rendered at their instance and in consequence of their agreement. This was not a mere dismissal by plaintiff, but a judgment based upon and entered in pursuance of the stipulation of the parties, and must be understood to amount to such an adjustment of the merits of the controversy by the parties themselves, through the judgment of the court, as would constitute a defense to another action for the same cause.

It is not material that the issue raised was merely one of law, for the judgment rendered was not upon demurrer but upon dismissal, and the authorities show that the doctrine of res adjudicata and estoppel by judgment applies to issues of law as well as those of fact.

The law in case of retraxit assumes the adjustment of all matters in dispute in the litigation, and this assumption finds support in this case upon the instrument of January 2, 1889, signed by petitioner and hereinabove recited on page nine of this opinion.

What was the effect of that document? Counsel for petitioner argue that this paper is a receipt, and not a release, and cannot be interpreted a surrender or abandonment by

the wife of the community rights, and they claim that the signer was not properly protected by legal advice when the instrument was executed, and rely upon the testimony of a subscribing witness, an attorney, to point its meaning merely to the expenses attendant upon the divorce litigation. It is argued that it could not possibly have referred to an inchoate right, a mere expectancy, dependent upon the prior decease of her husband; something that might not occur in the order of nature anterior to her own demise, and that it has no reference to anything but the main issue. It could not have altered her legal relations to the property, and she is here demanding her due. As heir at law she cannot be devested of her rights by any instrument so meager and restricted as this receipt, which is not a relinquishment. It is insisted by her counsel that petitioner has a substantial claim upon the estate of decedent, and is entitled to the consideration of the court in a meritorious manner. She is not estopped by any act of hers in evidence from asserting her spousal rights; her conduct throughout has been consistent with her claim. Furthermore, it is insisted that the relations of the spouses must always be borne in mind; so long as the law had not severed their status, although separated by agreement, they occupied toward each other confidential and fiduciary relations.

This is the proposition of petitioner upon the final point.

In order to arrive at an accurate answer to these arguments, we must consider the circumstances of the execution of that document at the time of its date, January 2, 1889, for it must be explained, if it be not self-explanatory, by reference to those circumstances and the matters to which it relates. That instrument standing by itself shows that whatever was in controversy was settled, satisfied and discharged. What were the matters in controversy? One of them was her claim to community rights. She had sued for a divorce and for a division of "the common property." Three years before this paper was signed by her petitioner had entered into articles of separation for their natural lives with her husband, by which she had bound herself to refrain from molesting him or interfering with his acts or conduct or movements in any way, and waiving and renouncing all right to institute suit for divorce. The relation of husband and wife, with its con-

fidential character, ceased from that moment. The execution of those articles was equivalent to a divorce from bed and board as it exists elsewhere. To all intents and purposes the spouses were the same as strangers after the deed of separation, February 26, 1886. They then sustained no fiduciary or confidential relations. After that point of time they lived separate, and on April 30, 1888, in violation of her covenant to the contrary, she filed her bill for divorce, and it was not until just after the expiration of that year that this receipt or release was executed by her.

In view of these facts, what did this document embrace and comprehend? It was "in full settlement, satisfaction, and discharge of *all* matters in controversy." It could not include more, nor did it comprise less, than each and every controverted issue or matter in the action for divorce.

Counsel for petitioner contend that this instrument did not purport to comprehend community property, and that this is not an attempt to rescind but to exclude a subject which the signer did not intend to include in it. She is not seeking to disaffirm her act, but she is objecting to the application of the written evidence of it to a subject she was led to believe was not included in it.

It seems to this court that this is not a case such as one cited by the counsel, where it was held that the duties of the husband toward the wife, arising out of the personal relation of trust and confidence, required from the husband obligations of the highest good faith in any dealings between them, and precluded him from obtaining advantage over her by means of any misrepresentations, concealments or adverse pressure. The facts here do not fit into the principle of the citation. This is not that case; but it is a case where the spouses were dealing at arm's-length. She was not dependent upon him or his counsel; she had her own. She did not deal directly with her separated spouse; he acted through his attorneys and she had advisers of her own selection, although one of them was at that time no longer living; but the instrument was not signed by reason of any connubial or other confidence reposed in her husband.

The instrument was what it purported to be on its face — a full settlement, for valuable considerations, of all matters

in controversy in the divorce case, which included neces-sarily a complete adjustment of any rights she might have preserved by her deed of separation in the community property. It was *not* a mere receipt, but was a contract for a substantial and valid consideration, therein expressed in pecuniary terms, relinquishing all rights, past, present and prospective, in or to the subject matter of the litigation. It was a final compromise of all their differences and a termination of their disputes. It was so acted upon by the releasee, and it would seem inequitable to allow its validity to be now gainsaid by the releasor. The transaction was fair. In addition to the thousands of dollars passed to her by its terms, there were other valuable considerations, including an implied waiver of any right he might have to recover the ninety odd thousand dollars' worth of property transferred to her under the contract which she had broken by her institution of an action for divorce, which breach was repaired by this release, an instrument constituting the conclusion of the conjugal controversy for all time. Application denied.

Where the Parties to an Action Settled their dispute and agreed to a dismissal, this amounts to a retraxit and to a decision on the merits: State Medical Examining Board v. Stewart, 46 Wash. 79, 123 Am. St. Rep. 915.